**James H. ANTIPAS, Petitioner,**

v.

**UNITED STATES of America,**
**Respondent.**

**Misc. 1513.**

United States Court of Appeals District of Columbia Circuit.

March 23, 1961.

Petition for Rehearing En Banc Denied May 24, 1961.

Bazelon, Circuit Judge, dissented.

James H. Antipas, appellant, pro se.

Messrs. Oliver Gasch, U. S. Atty., Carl W. Belcher and Frank Q. Nebeker, Asst. U. S. Attys., were on the pleadings for respondent.

Before PRETTYMAN, BAZELON and BASTIAN, Circuit Judges.

Order

PER CURIAM.

On consideration of petitioner's petition for leave to prosecute an appeal without prepayment of costs, of respondent's opposition, and of petitioner's reply, it is

Ordered by the court that the petition for leave to prosecute an appeal without prepayment of costs is denied.

Dated: February 24, 1961

BAZELON, Circuit Judge (dissenting).

This petition for leave to appeal in forma pauperis is presented, without counsel, by a prisoner who has been certified as psychotic by the Federal Bureau of Prisons and is presently confined at the Federal Medical Center at Springfield, Missouri. He seeks to appeal from the denial of this third successive motion for post-sentence relief. He was not represented by counsel on any of these motions, and each was denied by the District Court without hearing. It does not appear that he sought to appeal from the denials of the first two motions.

From the rambling and confused statements of the second and third motions, there can be extracted the allegation, *inter alia*, that petitioner was incompe-

tent to voluntarily and understandingly enter the plea of guilty upon which he was sentenced on March 21, 1958. In his papers in this court, petitioner asserts for the first time that in July 1958 the Federal prison authorities determined that he was suffering from schizophrenia. This assertion, if true, would lend new and specific content to petitioner's allegation of incompetency—an issue reviewable under 28 U.S.C. § 2255.[1]

"[T]he motion and the files and records of the case"[2] in the District Court, bearing upon the matter, disclose the following: Petitioner, who is now 27 years old, has been at odds with the law since he was 14. A narcotics addict since his early teens, he has a record of sixteen arrests in various parts of the country. The sentence he is presently serving represents his eighth felony conviction.

In 1954 after pleading guilty to various charges of robbery and interstate transportation of a stolen automobile, petitioner was confined in the Federal Reformatory at El Reno, Oklahoma. While there, a psychiatric evaluation[3] described him as:

> "* * * one who has a very little insight into his inability to make a satisfactory adjustment to society; rationalizing his antisocial behavior to a marked degree. He has not seemed to be able to assume adult responsibility and has been discharged from the service due to neurosis. There is a diagnosis (1951) of no mental disorder but noteworthy impairment of reasoning and judgment."

Petitioner was diagnosed as a

> "Sociopathic type personality, narcotic addiction, possible schizoid personality characteristics."

Petitioner was transferred from El Reno to the Federal Penitentiary at Lewisburg, Pennsylvania, in August of 1954. There he was examined and "* * gave the impression to one examiner (not a psychiatrist) that he should be under observation for possible simple schizophrenia."[4] Because of his good behavior, however, petitioner was not referred for psychiatric examination or treatment but was conditionally released in November 1956. Less than a year later, he was indicted for the offense upon which the sentence presently under attack was imposed.

Before plea and sentence, petitioner's court-appointed counsel requested a mental examination. The District Court, by order filed December 6, 1957, directed that petitioner be committed to St. Elizabeths Hospital for a determination of his competency to stand trial. Because no bed was available there, petitioner was temporarily committed to D. C. General Hospital, from which he twice attempted to escape.

Although the court did not authorize an examination at that hospital, its Chief Psychiatrist nevertheless certified to the court, on January 7, 1958, less than one month after petitioner had been there, that petitioner had been examined and found sane, competent, and capable of participating in his own defense. Because defense counsel objected to the place and manner of this examination, the United States Attorney moved that the court authorize retroactively this examination and that it accept the certification as being in substantial compliance with D.C.Code, § 24–301. Upon hearing, defense counsel raised the additional objection that the District of Columbia General Hospital staff had issued a hasty

1. Bishop v. United States, 1955, 96 U.S. App.D.C. 117, 223 F.2d 582, judgment vacated 1956, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835.

2. 28 U.S.C. § 2255 (1958).

3. Classification Study by Charles A. Yale, M.D., S. A. Surgeon, Public Health Service, dated October 14, 1954, Federal Reformatory, El Reno, Oklahoma.

4. Letter from the Warden of Lewisburg to Frank Smith, Esquire, dated January 31, 1958. Mr. Smith defended Antipas on the charges for which he is presently serving sentence.

report to rid themselves of a custodial problem.

In a memorandum order granting the Government's motion, the court noted the following, *inter alia*: that the Senior Staff Psychiatrist who had interviewed petitioner, once at length and briefly upon two other occasions, had conducted the examination; that another psychiatrist conducted similar examinations of him; and that the Senior Staff Psychiatrist had testified that petitioner's examination was conducted according to the standards followed in cases in which examinations had been ordered by the court.

Thereafter, on March 21, 1958, the court accepted petitioner's plea of guilty and sentenced him for two to nine years with a recommendation that his case be studied to determine the proper institution of confinement.

Pursuant to this recommendation, petitioner was examined at the Lewisburg Penitentiary. The examination report, by Manley B. Root, M.D., Senior Surgeon, Chief, Psychiatric Service, dated July 18, 1958, stated, *inter alia*, that "* * * it is quite evident that [psychosis] has been developing [in petitioner] for many years." The report also stated that petitioner was a confirmed narcotics addict and that he

> "* * * is basically something [suffering] from a malignant schizophrenic psychosis of the paranoid type. He is being divorced from reality, there is a great deal of dis-association and there probably are at least the beginnings if not actual incidents of auditory and visual hallucinations. There are bizarre somatic sensations and there can be no doubt a subject who has to constantly hold and manipulate his penis from shrinking into his abdomen is actually a fear of this fear of this symbol of castration [*sic*?]. This process is found [*sic*?], I believe, to become worse and worse and I believe that he will be very soon frankly suffering from a schizophrenic reaction of the paranoid type.
>
> "* * * [I] believe further that this man was psychotic at the time of his trial. * * * I further more believe it is demonstrated that the instant offense was committed because of his need for narcotic drugs, and was not a product of his psychosis."

This diagnosis was made "* * * despite the fact that during examination [at] the District of Columbia Hospital before sentence the subject was found competent for trial and accordingly was not sent to St. Elizabeths' Hospital for further observation." [Ibid.]

On the basis of these findings at Lewisburg, petitioner was transferred to the Medical Center at Springfield where the Lewisburg findings were confirmed in a report by Theodore Anderson, M.D., Staff Psychiatrist, dated December 24, 1958, which concluded that:

> "In view of this patient's severe psychotic disability and his chronic anxiety level with repeated acute exacerbations, it is recommended that he be started on rather heavy doses of tranquilizing medication and he be given a rather reassuring firm, supportive type of interpersonal support. * * *"

In a subsequent report by Ervin F. Hoffman, M.D., Senior Surgeon, dated January 6, 1959, petitioner was again described as "* * * a narcotic addict who is now psychotic suffering from a schizophrenic reaction of the paranoid type." This report also states:

> "On his certification as psychotic by a board of examiners on July 25, 1958, it was their opinion *that he was psychotic at the time of his trial*, that the offense was not the product of his mental disorder; that he was, at the time of his trial, able to understand the nature and consequence of his offense and *he was able to intelligently cooperate with counsel in his own defense*." [Emphasis supplied.]

No such certification appears in the files and records of the District Court in this case.

The latest report from the Medical Center, by E. Mansell Pattison, M.D., Staff Psychiatrist, dated August 3, 1960, indicates that petitioner is still on certified psychotic status and continues to require psychiatric care.

In light of all the foregoing matters, I would, at the very least, withhold action on the present petition for leave to appeal in forma pauperis and appoint counsel to file a memorandum in support of the petition. In my opinion the papers in this case suggest at least three substantial questions which require careful consideration upon adequate briefs and arguments of counsel: [5]

(1) Is the pre-trial determination of petitioner's competency, in which petitioner was found to be "sane," subject to collateral attack under § 2255 on the basis of the post-trial determination by the Prison Bureau—made pursuant to observation and examination commenced shortly after the plea of guilty had been entered and sentence imposed—that petitioner was psychotic; that the psychosis "has been developing * * * for many years"; and that "he was psychotic at the time of his trial"? [6]

(2) Under the bare allegation of incompetency to plead, may the District Court be charged with notice of the Prison Bureau's determination of petitioner's mental condition appearing in "the motion and the files and records of the case" which the District Court is required by § 2255 to examine in denying relief without a hearing; or, if the District Court is not chargeable with such notice, is petitioner's incapacity a "justifiable reason" [7] for his failure to specifically allege the determination by the Prison Bureau in any of his previous motions in the District Court?

(3) If one or both of the questions in (2) are answered in the affirmative, then do the matters contained in "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief"—this being the determination required by § 2255 in order to deny petitioner relief without a hearing?

These and, perhaps, other questions inhere in the unfortunate circumstances of this case.

It may be said that the question of petitioner's competency at the time of plea and sentence is of little consequence since he will be confined in a mental hospital in any event. But I think the question is one of transcendental importance. A judgment of conviction depends upon it. Its proper resolution is therefore vital to our moral as well as our legal system. "The trial and conviction of a person mentally and physically incapable of making a defense violates certain immutable principles of justice which inhere in the very idea of free government." Sanders v. Allen, 1938, 69 App. D.C. 307, 310, 100 F.2d 717, 720.

Accordingly I dissent from the action of the court denying petitioner's request for leave to appeal in forma pauperis.

Memorandum in Support of Denial of Leave to Appeal in Forma Pauperis

BASTIAN, Circuit Judge.

As Judge Bazelon has written a dissent, I am impelled to write this memorandum in support of the denial by Judge Prettyman and me of the petition for

5. Cf. Ellis v. United States, 1958, 356 U.S. 674, 78 S.Ct. 974, 2 L.Ed.2d 1060.

6 Section 4245 of Title 18 authorizes the Director of the Bureau of Prisons to certify to the District Court which imposed sentence "* * * *that there is* probable cause to believe that [the prisoner] was mentally incompetent at the time of his trial, *provided the issue of mental competency was not raised and determined before or during said trial* * * *." (Emphasis supplied.) Since the issue was raised and determined before trial in the present case, this section is plainly inapplicable.

7. See Smith v. United States, 1959, 106 U.S.App.D.C. 169, 270 F.2d 921.

leave to prosecute an appeal in forma pauperis in this proceeding under 28 U.S.C. § 2255. In my opinion, this case presents another example of abuse of that section of the Code.[1]

Antipas [petitioner] was indicted on October 31, 1957, for violation of the narcotic laws, 26 U.S.C. § 4724(b), and was held under $10,000.00 bond. He was promptly arraigned and pleaded not guilty. He immediately filed *pro se* motion for reduction of bond and a motion for speedy trial, both of which were denied as the case had been promptly set for hearing. Thereafter, on November 14, 1957, he filed a motion for a bill of particulars, after which counsel was appointed and the motion withdrawn. On December 6, 1957, his counsel filed an affidavit stating that petitioner had requested an examination as to his mental competence to stand trial; and, on December 10, 1957, the court entered its order committing petitioner to St. Elizabeths Hospital for such an examination. Thereafter, on January 7, 1958, Dr. John D. Schultz, M.D., Chief Psychiatrist at District of Columbia General Hospital, filed with the court the following statement:

> "Our examinations reveal this man to be sane, competent and capable of participating in his own defense."

It appears from a memorandum filed on January 30, 1958, by the late Chief Judge Laws that a hearing in open court was held on January 24, 1958, on the question of defendant's competency to stand trial and on objection that the mental examination should have been made by St. Elizabeths Hospital. In that memorandum, the following appears:

> "At a hearing in open court held January 24, 1958, the Senior Staff Psychiatrist of District of Columbia General Hospital testified that defendant Raymond J. Antipas was given the same type of examination as to his mental competency as he would have received had he been sent to District of Columbia General Hospital for examination by formal order of the Court. The Senior Staff Psychiatrist examined defendant once at length and briefly on at least two other occasions; another psychiatrist at the Hospital conducted similar examinations. Reports prepared in the usual course of events by others at the Hospital were considered. The District of Columbia General Hospital reported to the Court that the defendant is 'sane, competent and capable of participating in his own defense.' The United States Attorney has applied to the Court to now authorize the examination previously made by District of Columbia General Hospital, accept its report and to set defendant's case for trial. Defendant opposes this action claiming the order for examination by St. Elizabeths Hospital should stand and the case be postponed for trial until their report is received.
>
> "The Court is of opinion it should consider this matter solely from the point of view as to whether defendant would be prejudiced in any manner by the action sought by the United States Attorney. Only two possible disadvantages to the defendant have been indicated. The first, as stated by counsel for defendant, is that physicians at St. Elizabeths Hospital might disagree with those at District of Columbia General Hospital. The second is that since it developed that while at District of Columbia General Hospital two escape attempts were made by the defendant, those in charge of the Hos-

1. See Pasley v. Overholser, 1960, 108 U.S. App.D.C. 332, 282 F.2d 494, wherein we cite, on this subject, articles entitled "Use and Abuse of the Writ of Habeas Corpus" by Honorable Louis E. Goodman, Chief Judge, United States District Court for the Northern District of California, 7 F.R.D. 313, and "Limiting the Abuse of Habeas Corpus" by the late Honorable John J. Parker, Chief Judge, United States Court of Appeals for the Fourth Circuit, 8 F.R.D. 171.

pital may have been more anxious to be rid of the defendant than to correctly pass upon his mental qualifications. The Court is not impressed by either of these points. The testimony of the Senior Staff Psychiatrist convinced the Court that the examination of defendant was precisely the usual type made when previous orders to examine a defendant are made; and there was no bias on the part of those examining the defendant in the present case due to his attempts to escape. The Court further found from the testimony before it that there is no apparent doubt as to defendant's present ability to stand trial. * * "

On February 13, 1958, appearing in person and by his attorney in open court, petitioner pleaded guilty of the charges on which he was indicted. Whereupon the case was referred to the probation officer of that court. On March 14, 1958, petitioner filed a motion for leave to withdraw his plea of guilty. This motion he voluntarily withdrew on March 21, 1958. He was then sentenced by Chief Judge Laws to serve two to nine years. At the proper place in the order of commitment, Judge Laws stated:

> "The Court recommends that a special study be made to determine the proper kind of institution to which the defendant should be committed."

At the hearing before Judge Laws at the time of sentencing, the following occurred:

> "Mr. Smith [counsel for the petitioner]: If Your Honor please, I would observe on behalf of this defendant that there are pending against him a Federal charge in Baltimore and a State charge in Prince Georges County, all arising out of the events for which he is presently before you. I ask Your Honor to bear those other accusations and proceedings in mind in fractionalizing the penalty of the case.

"I would also observe that this defendant is still quite young. He is not yet 26 years of age. He is beyond the province of the Youth Correction Act, but he is still young; and by his own admission, he is addicted to narcotics, which, in my opinion, were very influential in causing him to commit these offenses.

"I ask, therefore, that Your Honor recommend that he be committed to Lexington or some similar remedial institution for this addiction.

"I finally point out that in my view of the law under which he stands guilty the purpose of that law is to prosecute syndicates of big-time operators in Interstate traffic in narcotics; and this defendant certainly is neither a leader nor a member of such a syndicate. The inducement to the offense was his own craving for the narcotics.

"The Court: Would you like to say anything?

"The Defendant: Yes, Your Honor. I believe I am here because of my weakness for that drug. I pray the court in sentencing there be consideration so that rehabilitation can start at the beginning. As Mr. Smith told the Court, I am young; and I would like to get myself together sometime.

"The Court: You understand that the judges don't have any pleasure in sending away young men, you know that, don't you?

"The Defendant: Yes, sir.

"The Court: It isn't very pleasant for a judge to send away a young man, and I do think that you have some personality problems that will need studying, and I am going to ask they be studied.

"I have already talked to the probation officer this morning about writing to the penal institutions and asking them to make a special study of your case as to where they

"put you; and if Lexington is the place, then they will do that. There may be a better place, but I am asking them to make a special study in your case. Do you see?

"The Defendant: Yes, sir.

"The Court: And I am also taking into account the fact that you have been locked up over six months and that you pleaded guilty. The best hope that you could possibly have is that if you cooperate and they think that you are cured that maybe they would give you a chance on parole. So I will fix that reasonably early, but I do have to give you a substantial sentence under this law.

"The sentence is from two to nine years, with a request of the probation officer to ask a study be made at the penal institution as to where you should be assigned.

"Mr. Smith: May I ask Your Honor about the Federal charge pending in Baltimore?

"The Court: I don't have anything to do with that. They will undoubtedly take this sentence into account."

The hearing on the sentence was then concluded. The record discloses that petitioner is presently confined at the Medical Center in Springfield, Missouri.

On March 25, 1958, petitioner filed *pro se* a letter in the nature of a motion to vacate judgment or reduce sentence. On April 15, 1958, the court [Chief Judge Laws] denied the motion and no appeal was taken.

On January 19, 1959, the petitioner filed another motion to vacate judgment or reduce sentence. In this he contended that he was insane at the time of the crime and was incompetent to voluntarily and understandingly enter a plea of guilty. This motion was denied on January 30, 1959, by Judge Letts. No appeal was taken.

On February 8, 1960, under 28 U.S.C. § 2255, petitioner filed in the District Court his third motion to vacate sentence. This motion, in substance, made the same claims contained in the previous motions. It was alleged that counsel was ineffective in not allowing him to interpose the defense of insanity, that he was coerced into pleading guilty, and that his plea was not voluntarily made because he was mentally incompetent at the time of the plea and insane at the time of the offense.

On May 27, 1960, petitioner's counsel filed his affidavit stating in effect that in the course of developing a defense he had had a number of conferences with petitioner at D. C. General Hospital, the District Courthouse and the District Jail, and had fully canvassed with him the nature of the charges and the possibilities of trial and sentence. He also had had numerous conferences with the co-defendant and the parents of the two defendants. Counsel, further, denied coercing petitioner or making any promises in regard to the sentence.

The record is clear that court appointed counsel did everything within reason to properly represent petitioner. With respect to the motion to withdraw the plea of guilty, counsel stated that he had filed a motion and was prepared to argue it when petitioner himself determined to withdraw it.

On June 3, 1960, the District Court [Judge Letts] denied petitioner's motion of February 8, 1960, on the ground set forth in the statute. Thereupon, petitioner requested leave to appeal in forma pauperis, which the District Court denied on June 22, 1960. The present petition was filed in this court on July 14, 1960. This we have this day denied.

Petitioner contends here that he was incompetent to enter his plea of guilty, and again claims that counsel was ineffective. We think the denial of the motion under consideration was properly within the discretion of the trial court. See Wilhite v. United States, 108 U.S. App.D.C. 279, 281 F.2d 642; Smith v. United States, 106 U.S.App.D.C. 169,

270 F.2d 921; Turner v. United States, 103 U.S.App.D.C. 313, 258 F.2d 165.

The dissenting opinion of our colleague states that "from the rambling and confused statements of the second and third motions, there can be extracted the allegation, *inter alia,* that petitioner was incompetent to voluntarily and understandingly enter the plea of guilty upon which he was sentenced on March 21, 1958." The short answer to this is that petitioner has filed a brief and memorandum obviously prepared by persons with legal knowledge and, while the petition may be inartfully drawn, nevertheless its meaning is clear. It is true that for the first time he refers to the fact that in July 1958 federal prison authorities determined that he was suffering from schizophrenia. However, from the record it is clear that nowhere does it appear that any mental condition existed from which he might have been suffering at the time of his plea, and nowhere does it appear that the crime was the product of any psychosis from which he might be suffering. Petitioner has a long record of arrests and convictions. He is a narcotic addict and the sentence he is presently serving represents his eighth felony conviction. We think the "evidence" submitted by him is in no sense sufficient to give rise to a belief that he was insane, incompetent or incapable of participating in his own defense at the time his plea of guilty was entered, or that he was unable to understand the nature of the proceedings or unable to advise with counsel in connection with his defense. Everything that appears is to the contrary. A report of his psychiatric evaluation in 1954, while he was in the Federal Reformatory at El Reno, Oklahoma, states:

> "There is a diagnosis * * * of no mental disorder but note worthy [sic] impairment of reasoning and judgment."

He was diagnosed at that time as a "sociopathic type personality, narcotic addition [sic] possible schizoid personality characteristics." He was transferred from El Reno to the Federal Penitentiary at Lewisburg, Pennsylvania, in the same year. At the latter place, there was suggestion that he be under observation for simple schizophrenia but he was not referred for psychiatric examination or treatment, and he was released in November 1956. The warden at Lewisburg, in response to a request by counsel for petitioner for medical and psychiatric record of petitioner, replied on January 31, 1958, for use in connection with petitioner's competency to stand trial:

> "Our Chief Medical Officer has given us the following report:
>
> " 'I note that while with the United States Army May 1953, he [defendant] received a thorough mental examination and a diagnosis was made as follows: "Anti-social personality, chronic, severe, manifested by extreme hostility, arrogance, severe mal-adjustment [sic] to civilian and military life, seclusiveness and unpredictable behavior." Another medical examination was performed by one of the Federal Prison Doctors, Barles A. Yale, M.D., who came to the conclusion that this patient was a "Sociopathic type personality, narcotic addiction, possibly schizoid personalty [sic] characteristics." The Psychologist, Seth A. Nation, "reported superior intelligence, alert appearing. This young man states would like to learn a trade or do clerical work here. He should be able to adjust in either type of work." This examination appears to have been made in 1954.
>
> " 'When first examined on admission to the Federal institution, the patient gave the impression to one examiner (not a psychiatrist) that he should be under observation for possible simple schizophrenia. He also was found to have some chronic infection of the tonsils. Otherwise his general health was found to be good. From the time of admission until the time he was finally released

November 1956 his general demeanor and behavior was such that it was not considered necessary to refer him for psychiatric observation or treatment, so that no further mental examinations were made of [sic] considered necessary.' "

The report referred to in Judge Bazelon's dissent as the evaluation made by the psychiatric staff at Lewisburg on July 25, 1958, was from the Senior Surgeon, United States Public Health Service, Chief of Psychiatric Services. However, in the Report of Presentation at the Medical Center, Springfield, Missouri, dated July 6, 1959, the following appears:

"Antipas is a narcotic addict who is now psychotic, suffering from a shizophrenic [sic] reaction of the paranoid type. On his certificate as psychotic by a board of examiners on July 25, 1958, it was their opinion that he was psychotic at the time of his trial, *that the offense was not the product of his mental disorder; that he was, at the time of his trial, able to understand the nature and consequences of his offense and he was able to intelligently cooperate with counsel in his own defense.*" [Emphasis added.]

Congress provided in 18 U.S.C. § 4245, entitled "Mental incompetency undisclosed at trial," that whenever the Director of Prisons shall certify that a person convicted of an offense against the United States has been examined by the board of examiners and that there is probable cause to believe that such a person was mentally incompetent at the time of his trial, the Attorney General shall transmit the report and certificate to the clerk of the District Court wherein the conviction is had, *provided the issue of mental capacity was not raised and determined before or during the trial.* While, of course, we are not bound to give this proviso the force of law in this case, it is significant that Congress added the words we have emphasized; evidently, it was to prevent just the sort of action that petitioner is taking here.

In this connection, we deem it appropriate to quote a part of the address of the distinguished Governor of California, Edmund G. Brown, delivered before the National Conference of Attorneys General on July 5, 1960:

"I am sincerely convinced that a means must be found to reduce the endless round-robin spiral of protracted litigation which swings—by appeal, by certiorari, by writ and review, hearing and rehearing—from court to court, federal and state, asserting and reasserting in hardly altered fashion, essentially the same disputed issues, until, by the laws of chance if not of logic, there ensues what Mr. Justice Frankfurter has termed 'a juridical somersault.'

"We have seen in California, with bewildering frequency, a seeming inability to reach final decision in criminal cases. And my reading of the reports of decisions elsewhere convinces me that it is not unique with us. This has been largely manifested by a sharp increase in use of extraordinary writs, particularly habeas corpus.

"Let me say that I know the attorneys general of this country are sincerely and devotedly interested in preserving unimpaired the historic function of the writ of habeas corpus. Its sweeping power to cut across the forms and trappings of injustice is sacred to us all. We would continue its place of dignity in our system.

"And surely none can deny that we have witnessed in current times misuse of this great prerogative writ. This misuse itself constitutes a grave and formidable threat to its continued integrity. Of course, the state cannot insist on mere finality as if the ends of justice supply sanction for any means whatever. But I cannot help but feel, as a lawyer, a former attorney general, and now the Governor of a great state, that we do not lack the courage or the

will to find a constitutional way to restore appropriate balance to this threatening situation.

"The legal genius which developed the common law, which wrenched the Great Charter from King John, can hardly fail to serve us now. And the same spirit which transformed the nature of the writ of habeas corpus from a tool of only the privileged and made of it the excaliber [sic] for us all, must now be invoked to restore it to its untarnished gleam and sharpness.

"I share with real concern the often expressed fears that to place restrictions on our writ-appellate procedures may jeopardize the friendless and disadvantaged who need easy access to the judicial ear. These fears are real, and often proved, and always to be heeded. But still there is, in the very nature of our legal institutions, room and means to safeguard our liberties without revering license.

"I doubt there is any here whose state has not been vexed by what sometimes amounts to freewheeling through the halls of justice. Legislation has periodically been introduced in Congress suggesting various mechanical controls. Some of these measures are pending now. None of them which I have seen supplies any really acceptable alternatives.

"But as attorneys general assembled here in conclave, you have a weighty—and, I think, immediate—responsibility to search for answers and give direction in this field.

"I am aware that you have been considering this problem for at least four years, and that you have sifted through many proposals.

"But it seems to me that this is a matter of crucial concern to each of the states, and that it is imperative that this aspect of particular concern to the states be made clear."[2]

We think the claim that petitioner was incompetent and of unsound mind at the time of the plea and sentence is refuted by the record. He was, at his own request, subjected to a mental examination by an able psychiatrist and others at the hospital, who found him sane, competent and capable of participating in his own defense. There is no doubt whatsoever of the reliability of the plea of guilty. The record is clear that petitioner's competency to stand trial was carefully considered and determined by the able late Chief Judge Laws.

It seems to us further that, this being the third consecutive motion containing substantially the same grounds, the District Court was amply justified, on a complete examination of the record, in dismissing the motion.

I should add that if we permit the members of our bar, who voluntarily and willingly accept assignments to defend—without compensation—indigent persons accused of crime, and who, after they have diligently and competently performed their duties (as did appointed counsel in this case), to be vilified and unjustly criticized for their conduct of the cases, they will have received poor recompense for their efforts.[3] There are too many examples of this ingratitude in the abusive petitions and motions filed under § 2255. In large majority, the petitions brought to this court under that section are based on such unjustified criticism.

The petition for leave to appeal in forma pauperis is properly denied.

2. The petitions referred to above as filed by petitioner constitute but a small part of numerous petitions and motions filed by Antipas.

3. See Williams v. United States, 1960, 109 U.S.App.D.C. 18, 283 F.2d 382, dissenting opinion by Judge Burger.